# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| DEBORAH A. MADERA | : | Bankruptcy No. 06-13000DWS |
| | : | |
| Debtor. | : | |
| —————————————— | : | |
| | : | |
| DEBORAH A. MADERA, and | : | Adversary No. 06-0417 |
| MICHAEL MADERA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AMERIQUEST MORTGAGE CO., | : | |
| | : | |
| Defendant. | : | |
| —————————————— | | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Motion for Summary Judgment (the "SJ Motion") of Defendant Ameriquest Mortgage Company ("Ameriquest") and Plaintiffs' Motion for Permission to Amend Complaint (the "Amendment Motion").[1]  For the reason that follow, the SJ Motion is granted and the Amendment Motion is denied.

———————————————

[1]  As discussed below, I denied the Amendment Motion from the bench on the day of the hearing, but further elaborate my reasoning below.  Infra Discussion § II.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiffs Deborah ("Deborah") and Michael ("Michael") Madera (collectively "Plaintiffs") are co-owners of property located at 401 Twin Streams Drive, Warminster, Pennsylvania (the "Premises").[3] In January 2005, Plaintiffs obtained a loan from Option One Mortgage Company ("Option One") secured by a mortgage upon the Premises (the "Option

---

[2] In addition to the depositions, affidavits, and stipulated facts in the Joint Pretrial Statement, I have reviewed the documents attached to each party's motion. "As is true with other material introduced on a summary judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles A.Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722, at 384 (1998). Accord Johnson v. United States Postal Service, 64 F.3d 233, 237 (6th Cir. 1995) (ruling that the "failure to object to evidentiary material submitted in support of a summary judgment motion constitutes a waiver of those objections."); H. Sand & Co., Inc. v. Airtemp Corporation, 934 F.2d 450, 454-55 (2d Cir. 1991) (Rule 56 does not require parties to authenticate documents "where appellee did not challenge the authenticity of the documents in the district court."); Dautremont v. Broadlawns Hospital, 827 F.2d 291, 294-95 (8th Cir. 1987) (affirming summary judgment where appellant failed to object in district court to its consideration of documents not in compliance with Rule 56 and failed to demonstrate that district court's consideration of documents constituted reversible error); Giovacchini v. Perrine (In re Giovacchini), 1995 WL 80102, at *3 n.1 (E.D. Pa. Feb. 27, 1995) (citing Federal Practice and Procedure § 2722) (holding that unauthenticated medical reports would be considered in ruling on motion for summary judgment since no objection was raised thereto). Commenting further on this topic, another treatise offers the following insight:

> Rule 56(e) does not require parties to authenticate documents where the appellant failed to challenge the authenticity of the documents in district court. An evidentiary objection, not raised in district court, is waived on appeal. This rule is equally applicable to a summary judgment motion as it is for a trial. Consequently, Rule 56(e) defects such as unsworn or uncertified affidavits, deposition testimony or unauthenticated documents, are waived and those pieces of evidence will be admissible in a summary judgment proceeding if no motion to strike has been made at the district court level.

11 James Wm. Moore et al., Moore's Federal Practice § 56.14[2][c], at 56-184.1-56-185 (3d ed. 2001).

[3] Joint Pretrial Statement § II ("Uncontested Facts") ¶ 8.

One Mortgage").  The Option One Mortgage paid off a prior mortgage and provided Plaintiffs with a cash payout to pay for their son's college tuition.[4]  Plaintiffs do not have any documents from the Option One Mortgage or any prior mortgage transaction and have no recollection as to the basic facts of that loan such as loan amount and interest rate.[5]  Of relevance here, neither recalls whether they were issued title insurance with respect to the Option One Mortgage.[6]  No documentary evidence supporting the existence of such insurance was presented with the Ameriquest SJ Motion or response thereto.

Approximately six months following the Option One Mortgage transaction, Plaintiffs contacted Ameriquest to refinance their Option One Mortgage.  Deborah initiated the contact with Ameriquest by telephone and subsequently faxed to Ameriquest documents relating to Plaintiffs' income such as pay stubs and W-2 forms.[7]  Michael subsequently visited an Ameriquest office in Bensalem, Pa. and supplied financial statements from his credit union.[8]  Plaintiffs did not supply Ameriquest with any documents relating to the Option One

---

[4]  Deposition of Deborah Madera ("D. Madera Dep.") at 16-17.

[5]  D. Madera Dep. at 12-14; Deposition of Michael Madera ("M. Madera Dep.") at 9-11.

[6]  D. Madera Dep. at 17; M. Madera Dep. at 10.

[7]  D. Madera Dep. at 19-21.

[8]  M. Madera Dep. at 13.  This is inconsistent with Deborah's testimony that they had never gone to an Ameriquest branch office.  D. Madera Dep. at 21.

Mortgage nor do they recall having any discussion with Ameriquest on the subject of title insurance.[9]

There appear to have been several telephone conversations between Plaintiffs and Ameriquest. Ameriquest gave Plaintiffs an estimated interest rate of eight percent over the phone and were told that the rate could change depending upon the appraisal.[10] Michael states that the Ameriquest representative he spoke to told him the interest would be at a fixed rate.[11] Deborah recalls receiving a packet of documents through the mail, but could not specifically identify what those documents were and it does not appear Plaintiffs read these mailed documents.[12]

Plaintiffs entered into a loan transaction with Ameriquest on June 23, 2005 at a closing that took place in their home (the "Ameriquest Mortgage").[13] Several hours before the closing of the loan, an Ameriquest representative called and told Deborah that the value reflected in the appraisal was less than expected and that Ameriquest would not be able to offer an 8% fixed rate loan.[14] Despite this, Plaintiffs proceeded with the closing, which took

---

[9] D. Madera Dep. at 26, 45 ; M. Madera Dep. at 13.

[10] D. Madera Dep. at 23.

[11] M. Madera Dep. at 15.

[12] D. Madera Dep at 22.

[13] Uncontested Facts ¶ 1, 4.

[14] D. Madera Dep. at 24; Affidavit of Deborah A. Madera (D. Madera Aff.") ¶ 7, Exhibit A to Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment ("Pls. Mem.").

place at approximately 9:00 p.m.   The closing agent was Silk Abstract Company ("Silk Abstract").[15]

At the June 23 closing, Plaintiffs received another package of documents, none of which they could identify with specificity.[16]  However, they acknowledge signing various documents at the closing and authenticated their signatures upon loan documents presented to them during their depositions and attached to the SJ Motion.[17]  They have stipulated to having received a Federal Truth-in-Lending Disclosure Statement ("TILA Statement"),[18] a Settlement Statement ("HUD Form"),[19] Notices of the Right to Cancel within three days under TILA, and a One Week Cancellation Notice.[20]

Deborah asserts that the closing "was sort of rushed" though she identified no particular conduct by the closing agent nor did she or Michael tell the closing agent that they wanted to read the closing documents before signing.[21]  In fact she states that they did not read the documents until the next day.[22]  In contrast, Michael indicates that he at least reviewed the documents sufficiently to question the closing agent as to why the interest rate

---

[15]  HUD Form, Exhibit B to SJ Motion.

[16]  D. Madera Dep. at 31.

[17]  D. Madera Dep. at 29-39; M. Madera Dep. at 19-25.

[18]  Exhibit C to SJ Motion.

[19]  Exhibit B to SJ Motion.

[20]   Uncontested Fact ¶ 2.  As discussed more fully below, it appears that Ameriquest provides its own one-week period to cancel in addition to the three-day period required by law. Infra Discussion § II.

[21]  D. Madera Dep. at 31.

[22]  Id.

and monthly payments were higher than he anticipated from his earlier conversations with Ameriquest representatives.[23]   At the loan closing they were aware that they were getting an adjustable rate loan beginning at 8.450%, the amount of their monthly payment, and that they had one week to cancel the loan if they changed their mind.[24]   They did not raise the issue of the title insurance charge by Silk Abstract indicated on the HUD Form nor did they discuss title insurance with the closing agent.[25]   While they were unhappy with the terms of the loan, they nevertheless went through with it because they needed the cash payout to pay for college tuition for their son.[26]   Nor did they seek to rescind the loan within the week period allowed by Ameriquest.[27]

Plaintiffs made only one payment under the Ameriquest Mortgage.[28]   Ameriquest initiated foreclosure proceedings in the Court of Common Pleas, Bucks County, Pennsylvania.[29]   A default foreclosure judgment was entered against Plaintiffs on May 9, 2006.[30]   Deborah filed her bankruptcy case on July 19, 2006.  After the foreclosure

---

[23]  M. Madera Dep. at 18-19.

[24]  D. Madera Dep. at 29-30, 34-35; M. Madera Dep. at 18, 20-21, 23.

[25]  D. Madera Dep. at 34; M. Madera Dep. at 27.

[26]  D. Madera Dep. at 25; M. Madera Dep. at 19.

[27]  D. Madera Dep. at 35.

[28]  D. Madera Dep. at 48.

[29]  Uncontested Facts ¶ 11.

[30]  I take judicial notice of the docket report from the Court of Common Pleas, Bucks County, Pennsylvania.  Judicial notice of public filings is appropriate under Federal Rule of Evidence 201(b)(2).  See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir.2000).  See also Exhibit D to the Complaint (letter from Plaintiffs' counsel dated June 5, 2006 to Ameriquest, noting a default (continued...)

judgment, but prior to filing this adversary proceeding, her counsel sent a letter to Ameriquest, addressed to an office address in Bensalem, Pennsylvania (the "Scholl Letter"), presumably the same office that Michael visited.[31]  The Scholl Letter is dated June 5, 2006, alleges violations of federal and state law by Ameriquest, asserts a right to rescind the Ameriquest Mortgage, and purports to be "a qualified written request under the Real Estate Settlement Procedures Act, 12 U.S.C. 2605(5)(e)," for information such as unpaid interest and escrow balances, monthly payments, how payments were credited, etc.  (Emphasis in original).

By letter dated August 2, 2006, Ameriquest acknowledges receipt of the Scholl Letter, albeit not until July 27, 2006, and states *inter alia*, that it is researching the allegations and will respond upon completion of that research.[32]  Plaintiffs filed this adversary August 2, 2006.

The Complaint raises three claims.  Counts I and II allege that Ameriquest failed to accurately disclose the loan terms of the Ameriquest Mortgage as required under the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA").  Specifically, Plaintiffs allege that they were overcharged for title insurance and that the overcharge should have been disclosed as a "finance charge" under TILA.  Count I seeks damages and costs for the TILA violation

---

(...continued)
foreclosure judgement).

[31]  Exhibit D to Complaint.

[32]  Exhibit H to SJ Motion.  Ameriquest sent Scholl an earlier letter dated July 28, acknowledging receipt of only one page of the Scholl Letter and asking for transmittal of the entire letter by facsimile.  Exhibit G to SJ Motion.

while Count II seeks the remedy of rescission and statutory damages and costs for Ameriquest's failure to grant the rescission request in the Scholl Letter. Count III alleges that the Defendant violated the Real Estate Settlement Practices Act, 12 U.S.C. § 2610, *et seq*. ("RESPA"), by failing to respond to the Plaintiffs' "qualified written request" ("QWR") for certain information about the loan and seeks damages and costs.[33]

At the time Deborah and Michael filed this bankruptcy case and adversary proceeding, there was pending before me another bankruptcy case by another debtor named Jennifer Glauser, see In re Glauser, No. 15-19233 (filed July 7, 2005), as well as an adversary action by Jennifer Glauser and her husband against Duetsche Bank National Trust Co. and Ameriquest. Glauser v. Duetsche Bank Nat'l Trust Co.. No. 05-527 (filed August 19, 2005 and hereinafter the "Glauser Adversary"). Debtors' counsel David A. Scholl Esquire ("Scholl") represents the Glausers in those proceedings. Deborah is co-worker of Jennifer Glauser and was referred to Scholl by Mrs. Glauser.[34] Ameriquest was represented in the Glauser Adversary by the same counsel it has here, Sandhya M. Feltes, Esquire ("Feltes"). The claims in the Glauser Adversary are almost identical to Counts I and II of this Complaint. The Glausers allege that Ameriquest overcharged them for title insurance, which led to a disclosure violation under TILA and entitles them to damages and rescission of their

---

[33] The Complaint also includes a Count IV that alleges a violation of the federal Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq*. ("ECOA"), and seeks damages and costs. However, at the hearing Plaintiffs, through Scholl, expressly withdrew this claim.

[34] D. Madera Dep. at 46

mortgage.  The trial of the Glauser Adversary was completed before the discovery deadline in this adversary of October 20, 2006.[35]

Only after the close of discovery in this case and after Feltes filed the SJ Motion did Plaintiffs file the Amendment Motion, which seeks to:  (1) add a new theory of TILA liability against Ameriquest as a basis for rescission; (2) add a claim against Ameriquest for its alleged violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Act, 73 P.S. § 201-1, et seq. ("UDAP")[36] seeking rescission and damages; and (3) withdraw the RESPA claim against Ameriquest and reassert it against a newly added party, AMC Mortgage Services, Inc. ("AMC"), the servicer of the loan.  At the hearing on the Amendment and SJ Motions, Scholl conceded that he could assert his RESPA claim in a separate adversary against AMC.  Scholl did not press the Amendment Motion any further and I denied it from the bench, though I will further explain my reasons below.

Subsequently, Scholl filed a new adversary action on behalf of Plaintiffs against not only the servicer, AMC, but Ameriquest as well.  Madera v. Ameriquest, et. al, Adv. No. 07-0001 (filed January 2, 2007 and hereinafter "Madera II").  The claims against Ameriquest in the Madera II Complaint are the exact claims that are made in the Amended Complaint.

---

[35]   On February 16, 2006, several months prior to the instant adversary, I amended the pretrial order in the Glauser Adversary after a dispute arose regarding the Plaintiffs' last-minute addition of expert witness, William Hart.  I extended discovery solely for the purpose of adding expert testimony.

[36]   Like most of her sister states, Pennsylvania has adopted a statute which prohibits "unfair or deceptive acts and practices," hence the acronym "UDAP."

**DISCUSSION**

## I.

A motion for summary judgment is governed by Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 56 applicable in this proceeding pursuant to Federal Rule of Bankruptcy 7056.  Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The party moving for summary judgment must overcome the initial burden of demonstrating the absence of a material question of fact.  Celotex v. Catrett, 477 U.S. 317, 325 (1986).  The substantive law will determine which facts are material.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Id. at 255.  A court must find that the motion alleges facts which, if proven at trial, would require a directed verdict.  6 J. Moore, Moore's Federal Practice, ¶ 56.26 (2d ed. 1988).  If so, the respondent "must set forth specific facts showing there is a genuine issue for trial," and may not "rest upon the mere allegations or denials of the pleading."  Fed.R.CivP. 56(e).  If the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgement may be granted.  Anderson, 477 U.S. at 250.  The absence of a genuine issue for trial is evident where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party.  Mashusita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A.  The *Rooker-Feldman* Doctrine

Although the parties agree that this Court has jurisdiction to address the Plaintiffs'

claims, Joint Pretrial Statement at 1-2, it is axiomatic that parties cannot confer subject matter

jurisdiction upon a federal court by agreement.   See e.g.  Ins. Corp. of Ireland, Ltd. v.

Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104 (1982) ("[N]o

action of the parties can confer subject-matter jurisdiction upon a federal court.").   I am

obligated to raise the issue *sua sponte* if at any time it appears that subject matter jurisdiction

is lacking.   Club Comanche, Inc. v. Gov't of the Virgin Islands, 278 F.3d 250, 255 (3d Cir.

2002).   The *Rooker-Feldman* doctrine[37] prevents federal courts, other than the Supreme

Court, from exercising jurisdiction where they would effectively be sitting as appellate courts

in review of state court judgments.   In re Knapper, 407 F.3d 573, 580 (3d Cir.2005).   As most

recently elaborated by the Supreme Court, the doctrine prohibits bringing into federal court

"cases brought by state-court losers complaining of injuries caused by state-court judgments

rendered before the [federal] proceedings commenced and inviting [federal] court review and

rejection of those judgments."   Exxon Mobile Corp. v. Saudi Basic Industries Corp., 544 U.S.

280, 125 S. Ct. 1517, 1521-22, 161 L. Ed. 2d 454, 461 (2005).

A claim is barred from federal adjudication by the *Rooker-Feldman* doctrine if:

(1) "the federal claim was actually litigated in state court prior to the filing of the federal

action" or (2) "if the federal claim is inextricably intertwined with the state adjudication."

---

[37] The doctrine derives from two Supreme Court decisions: Rooker v. Fidelity Trust Co., 263
U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and Dist.of Columbia Court of Appeals v. Feldman, 460
U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).  It was most recently addressed by the Supreme
Court in Exxon Mobil, infra.

Knapper, 407 F.3d at 580.  A federal claim is considered to be inexorably intertwined with

the prior state adjudication if:

> (1) the federal court must determine that the state court judgment was
> erroneously entered in order to grant the requested relief, or (2) the federal
> court must take an action that would negate the state court's judgment.  In other
> words, the *Rooker-Feldman* doctrine does not allow a plaintiff to seek relief
> that, if granted, would prevent a state court from enforcing its orders.

Id.[38]

It is uncontested that a judgment in foreclosure was entered against the Plaintiffs on

May 9, 2006, i.e., before Deborah filed her bankruptcy case and Plaintiffs filed this adversary

proceeding.  Count II of the Complaint differs from the other counts in that it does not seek

damages but rather seeks to rescind, i.e to undo, the Ameriquest Mortgage.  Two of my

colleagues have held that such claim, whether brought under TILA or state law, in effect

negates the underlying state foreclosure judgment and therefore runs afoul of the *Rooker-*

*Feldman* doctrine.  See Randall v. Bank One (In re Randall), --- B.R. ----, 2006 WL 3833919

(Bankr. E.D. Pa., November 01, 2006) (Fox, J.) (TILA claim for rescission); Faust v.

Deutsche Bank National Trust Company (In re Faust), 353 B.R. 94 (Bankr. E.D. Pa.

September 26, 2006) (Raslavich, J.) (rescission claim under Pennsylvania UDAP).

Judge Fox provides a thoughtful analysis that I adopt by incorporation herein.

A simplified summary of the reasoning is that "[a] mortgage foreclosure action is dependent

upon the existence of a valid mortgage.  A proper claim that a loan has been rescinded under

section 1635 of TILA has the effect of invalidating the mortgage."  Randall, 2006 WL

---

[38] The fact that the judgment was entered by default does not affect the applicability of the
Rooker-Feldman doctrine.  Indeed, Knapper applied the doctrine to default judgments.

3833919 at *7.  Accord Faust, 353 B.R. at 100 ("it is indisputable that rescinding the loan would negate the state court [foreclosure] judgment").  I also find it persuasive that the Third Circuit Court of Appeals has followed this reasoning in a recent non-precedential opinion:

> In this case, the Superior Court [of Delaware] ordered judgment in favor of appellee based on Ayres-Fountain's default of the terms of the note and mortgage.  In her complaint filed in the District Court, Ayres-Fountain sought rescission of the mortgage and damages.  Thus, the relief she seeks would invalidate the Superior Court's judgment against her.

Ayres-Fountain v. Eastern Savings Bank, 153 Fed. Appx. 91, 92 (3d Cir.2005).  Similarly, granting the relief requested in Plaintiffs' Count II would require me to invalidate the mortgage and negate the foreclosure judgment.  I therefore lack jurisdiction to adjudicate this claim.

With respect to Plaintiffs' other claims for damages, Judge Fox correctly notes that generally such damages do not arise out of the judgment but rather stem from actions that occurred at or prior to the loan closing.  As such, these types of claims are not inexorably intertwined with a foreclosure judgment.  Randall, 2006 WL at *8-9.  Indeed, a borrower's claims for damages, which are personal claims, cannot be brought within a Pennsylvania foreclosure proceedings, which is strictly as in rem proceedings.  Id. at *5-6, 9-10.  Here, Counts I and III seek only damages.  They are personal claims of the Plaintiffs which do not arise out of the foreclosure judgment, but out of Ameriquest's actions and/or omissions at the time of the loan closing.  I will therefore exercise jurisdiction only over the these counts and address the SJ Motion with respect to those claims.

B.  Count I - TILA

Beginning with some statutory background, the purpose of TILA is to aid unsophisticated consumers lest they be easily misled as to the costs of financing.  Shepeard v. Quality Siding & Window Factory, 730 F.Supp. 1295, 1299 (D. Del. 1990).  To that end, TILA and the regulations promulgated thereunder require certain disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.  Id.

In 15 U.S.C. § 1604, Congress authorized the Federal Reserve Board to "prescribe regulations to carry out the purposes" of TILA.  Pursuant to this authority, the Federal Reserve Board promulgated "Regulation Z," which is memorialized in 12 C.F.R. § 226. Rossman v. Fleet Bank (R.I.) National Association, 280 F.3d 384, 389 (3d Cir. 2002). The Board "also published extensive 'Official Staff Interpretations.'  12 C.F.R. Pt. 226, Supp. I."  Id.  The Supreme Court has instructed that "[c]ourts should honor that congressional choice.  Thus, while not abdicating their ultimate judicial responsibility to determine the law. . . judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational." Ford Motor Credit Company v. Milhollin, 444 U.S. 555, 568, 100 S.Ct. 790 (1980).  See also Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219, 101 S.Ct. 2266 (1981) ("absent some obvious repugnance to the statute, 'Regulation Z' should be accepted by the courts, as should the Board's interpretation of its own regulation").  In analyzing the Debtor's contentions, my guideposts are therefore the statutory provisions of TILA as well as Regulation Z and the Official Staff Interpretations.

Pursuant to TILA, a lender must make certain material disclosures, including the "finance charge" associated with the loan. 15 U.S.C. §§ 1602(u), 1638(a); 12 C.F.R. §§ 226.17, 226.18.  This defined term includes all of those charges "payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.. . ."  15 U.S.C. § 1605(a). The settlement charges Ameriquest included in the prepaid finance charge are as follows:

| | |
|---|---|
| Loan Discount | $11,073.04 |
| Processing Fee | $    626.00 |
| Application Fee | $    360.00 |
| Administration Fee | $    239.00 |
| Tax Related Service Fee | $      70.00 |
| Flood Search Fee | $        9.00 |
| Interest | $      54.69 |
| Settlement/Closing Fee | $    250.00 |
| Courier Fee | $      64.00 |
| Tax Cert | $      40.00 |
| TOTAL | $ 12,785.73 |

HUD Settlement Form; Affidavit of Kailynn Bowling ¶ 5, Exhibit F to the SJ Motion. Plaintiffs' response to the SJ Motion does not challenge the accuracy of this calculation. Moreover, it comports with the TILA Statement provided to Plaintiffs, which indicates the "amount financed" as $ 223,464.27.[39] The amount financed is generally computed by taking the principal loan amount ($236,250.00) and subtracting the prepaid finance charge ($12,785.73).  12 C.F.R. § 226.18(b).

Ameriquest concedes that the remaining settlement charges were <u>not</u> included in the prepaid finance charge:

---

[39]  Exhibit C to SJ Motion.

Title Insurance (item 1108)   $1,543.75
Endorsements (item 1111)   $  200.00
Recording fees (item 1200)   $   78.50
Judicial Satisfaction   $   10.00

Bowling Aff. ¶ 6.  At the hearing on the SJ Motion, Scholl conceded that the only charge at issue here is the charge for title insurance.  Where the transaction involves an extension of credit secured by an interest in real property, as it does here, certain real estate related costs such as title insurance are specifically excluded from the definition of finance charge. 15 U.S.C. § 1605(e).  However, Regulation Z clarifies that such charges may only be excluded if they are bona fide and reasonable.  12 C.F.R. § 226.4(c)(7)(I).  There is no dispute that the title insurance charge is bona fide.  Rather, the dispute centers upon whether the title insurance charge is reasonable.

In determining whether a charge is reasonable courts have looked to determine if the disputed charges are comparable to the prevailing rates of the industry in the locality at the time of the transaction.  Brannam v. Huntington Mortgage Co., 287 F.3d 601, 606 (6th Cir. 2002) (quoting Grigsby v. Thorp Consumer Discount Co. (In re Grigsby), 119 B.R. 479 (Bankr. E.D. Pa. 1990), vacated on other grounds by 127 B.R. 759 (E.D. Pa. 1991)). The parties agree that the Manual of Title Insurance Rating Bureau of Pennsylvania ("TIRBOP Manual") serves to establish the prevailing rates and thus the "reasonable" rate for purposes of this proceeding. See Johnson v. Know Financial Group, LLC, 2004 WL 1179335, at *6 n.5 (E.D. Pa. May 26, 2004) (accepting Rate Manual as representing the relevant market for title insurance).  However, the parties dispute which rate within the TIRBOP Manual is applicable here.

Ameriquest charged Plaintiffs $1,543.75 for title insurance, which is the correct "basic rate" for a loan the size of the Ameriquest Mortgage. TIRBOP Manual, Addendum A (Schedule of Rates). However, Plaintiffs rely upon the following provision of the manual:

> When a refinance or substitution loan is made within 3 years from the date of closing of a <u>previously insured</u> mortgage or fee interest and the premises to be insured are <u>identical to or part of the real property previously insured</u> and there has been <u>no change in the fee simple ownership</u>, the Charge shall be 80% of the reissue rate.

TIRBOP Manual § 5.6 (emphasis added), Exhibit D to SJ Motion.[40] Plaintiffs assert that, since the Ameriquest Mortgage was a refinance of the Option One Mortgage six months prior, they are entitled to the lower rate under this provision. Ameriquest asserts that Plaintiffs were not entitled to the refinance discount because they did not produce any evidence of title insurance having been issued with the Option One Mortgage.

Both parties cite to opinions of my colleague, Judge Bruce Fox, that have addressed the reasonableness of title insurance charges in Pennsylvania for TILA purposes. See <u>Fields v. Option One Mortgage (In re Fields)</u>, Adv. No. 04-005, slip op., <u>affirmed</u> 2006 WL 2191342 (E.D. Pa. July 31, 2006); <u>Strong v. Option One Mortgage</u>, 2004 WL 5032530, (Bankr. E.D. Pa. Aug. 31, 2004).[41] In the most recent of these decisions, Judge Fox notes:

---

[40] As the highlighted terms indicate, there are three prerequisites to eligibility of the refinance rate. The only requirement challenged in the SJ Motion is the first, existence of prior insurance. Ameriquest has not raised whether the premises was identical to that which was previously insured or whether there was a change in the fee simple ownership.

[41] <u>Fields</u> and <u>Strong</u> address whether title insurance was "reasonable" as defined under the 1994 amendment to TILA, the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 et seq. ("HOEPA"), and the corresponding Regulation Z provision, 12 C.F.R. § 226.32(b)(1). While the parties agree that the Ameriquest Mortgage does not fall under the provisions of HOEPA, courts agree that the definition of "reasonable" is identical as used throughout the TILA statute, including HOEPA and Regulation Z. See <u>Strong v. Option One Mortgage</u>, 2004 WL 5032530, at *41 (Bankr.
(continued...)

The plaintiff implicitly maintains in this proceeding that the lender has the obligation to insure that a borrower pays the lowest permissible title insurance charge. . . I have previously held that, under certain circumstances, a lender may be responsible to charge a borrower the lowest rate for which she was eligible under Pennsylvania law. See In re Strong, 2004 Bankr. LEXIS 2363, at *94 (Bankr. E.D. Pa. Aug. 31, 2004) (*citing* Johnson, 2004 WL 1179335, at *7), affirmed on other grounds, 2005 WL 1463245 (E.D. Pa. 2005).

The notion that a lender has some evidentiary burden to demonstrate the reasonableness of loan charges will often comport with the general approach of placing the burden of proof on the party with the "best means of proof on a given issue at his disposal." In re Burwell, 107 B.R. 62, 67 (Bankr. E.D. Pa. 1989) (quoting In re Jordan, 91 B.R. 673, 684 (Bankr. E.D. Pa. 1988)). See Green Tree Fin'l Corp. v. Randolph, 531 U.S. 79, 96 (2000) (where fairness so requires, burden of proof of a particular fact may be assigned to "party who presumably has peculiar means of knowledge" of the fact) (*quoting* 9 J. Wigmore, Evidence § 2486 (J. Chadbourn ed., rev. ed. 1981)). For many types of charges, i.e., courier fees and broker's fees, the lender will have greater access to marketplace information to demonstrate the reasonableness of the fee.

But it is also true that, typically, a plaintiff bears the burden of proving her claims. See Patterson v. Chrysler Fin'l Co., 263 B.R. 82, 89 (Bankr. E.D. Pa. 2001) (plaintiff in adversary bears burden of proving by preponderance of evidence all elements of claims just as any plaintiff would in suit outside of bankruptcy). When considering the title insurance charge, the plaintiff has a greater evidentiary burden in this proceeding than she has acknowledged.

Id. at 28-29.  The parties in Fields stipulated that the plaintiff had in fact obtained title insurance with her prior mortgage.  Even assuming that fact, Judge Fox found that "the evidence does not support a finding that the defendant knew or should have known at the time of the loan transaction that the plaintiff qualified for the lower insurance rate. . . . the plaintiff had at least an evidentiary burden of production on this point." Id. at 30.  At the very least, "if a borrower contends that a lender failed to obtain the lowest title insurance rate

---

(...continued)
E.D. Pa. Aug. 31, 2004); Johnson, 2004 WL 1179335, at *8.

permitted by law, she has an affirmative burden to demonstrate that the lender knew or should have known of the facts justifying that lower rate." Id. at 31-32 (*citing* Jones v. Aames Funding Corp., 2006 WL 2845689, *5-7 (E.D. Pa. Mar. 8, 2006)).

Consistent with this reasoning, Judge Fox distinguished the facts before him to those presented to him in Strong v. Option One (In re Strong), supra, which also involved the reasonableness of title insurance and is cited by Plaintiffs here for support.  Though the plaintiffs in Strong had failed to produce a prior title insurance policy, they had nevertheless presented other facts to the court which proved that Option One knew a prior title policy existed:  (1) Option One had obtained the HUD Form from the prior lender that reflected a payment for title insurance; and (2) the entity which Option One hired to obtain title insurance expressly told Option One that it could obtain a lower reissue rate if it received a copy of the schedule A and B from the previous title insurance policy. Id. at 32 (*quoting* Strong, 2004 WL 5032530 at *34)).[42]

The plain language of § 5.6 of the TIRBOP Manual indicates three prerequisites for the discount: (1) the prior mortgage must have been insured; (2) the premises must be identical to that which was previously insured; (3) there must be no change in the fee simple ownership.  Plaintiffs bear the burden of proving that these underlying facts existed and Ameriquest knew, or should have known, these facts.

---

[42]  In addition, Judge Fox found that Option One had an affirmative duty to advise the plaintiffs to provide the prior policy.  First, Option One had conditioned the loan upon their obtaining title insurance.  Second, rather than allowing the plaintiffs to obtain the insurance, Option One had taken it upon itself to do so.  Id. Slip op. at 32.

Focusing upon the first requirement, Ameriquest notes that, unlike <u>Fields</u>, there is no stipulation that Plaintiffs had title insurance issued with respect to the Option One Mortgage. Since the existence of prior title insurance is the very foundation of their TILA claim, Plaintiffs must at least proffer evidence indicating a question of fact as to this issue. However, it is clear that they cannot.   Ameriquest has submitted the entire deposition testimony of Plaintiffs, in which both concede that:  (1) they do not have any records from the Option One Mortgage; (2) they do not recall whether they were issued title insurance in that transaction; and (3) they have no recollection whether they even talked about title insurance with any Ameriquest agent.  In response to the SJ Motion, Plaintiffs have failed to produce a single document or witness that indicates title insurance was issued with the Option One Mortgage.

Plaintiffs assert that "the very presence of a prior loan is [sic] should constitute sufficient 'evidence' of an earlier policy as to trigger the applicability of a lower rate." Plaintiffs' Mem. at 9.  They fail to provide, nor have I found, any legal authority for this proposition.  Even the court in <u>Strong</u> did not rely upon the lender's mere knowledge of the existence of the prior loan but rather that the lender was "sufficiently familiar with the [prior] ContiMortgage loan to know that a . . . title insurance policy existed." <u>Strong</u>, 2004 WL 5032530 at *34.  There is no evidence on this record that Ameriquest had  knowledge of any specifics of the Option One Mortgage beyond a payoff amount.

Plaintiffs also rely on the affidavit of William C. Hart, their proffered expert on title insurance ("Hart" and the "Hart Aff.").[43]  While Plaintiffs do not cite to any particular portion of his report, I did find one section that appears to pertain to their assertion:

> The Defendant/Lender knew the nature of the proposed transaction was the refinance of the existing Option One Mortgage.  And the Defendant/Lender knew the Plaintiff/Borrower was looking for better terms and reduced monthly costs.  It is immaterial whether Ameriquest or Silk Abstract Company, the title closing agent, had actual knowledge that Option One would have insisted upon the Plaintiff/Borrower obtaining title insurance coverage for its prior mortgage in the form of a 1992 ALTA Loan Policy.  What's relevant is they should have asked.  And, even if the Plaintiff/Borrower didn't know or, didn't know what title insurance was, Ameriquest certainly knew that a lender cannot make a loan in a major metropolitan area that it expects to sell on the secondary market without obtaining an ALTA Loan Policy of title insurance insuring that its lien is in first lien position.  That is a requirement of the secondary market.

Hart Aff. ¶ 23.  Even giving credence to Hart's assertion for the purpose of the SJ Motion, he expressly limits his statement to lenders that sell their mortgages on the secondary market.  Unfortunately, nowhere in this record is there evidence that Option One is a seller on the secondary market or that it intended to sell Plaintiffs' mortgage on the secondary market.  This is not surprising, given that there is no evidence whatsoever pertaining to the Option One Mortgage.

Moreover, Hart's assertion assumes that Option One was not negligent.  As this and numerous TILA claims pending in this Court demonstrate, mortgage companies do not always do what they are supposed to do.  Even assuming that most large institutional lenders require title insurance be placed before making a loan, there is not a scintilla of evidence that Option One did so with respect to Plaintiffs' mortgage.

---

[43]  Mr. Hart also testified as a title insurance expert in the Glauser Adversary.

At best, Hart's affidavit raises an issue of fact as to whether Ameriquest had a duty to inquire about prior title insurance.  Assuming it did, there is nothing on this record to indicate that such an inquiry would have revealed the existence of prior title insurance.[44] As noted by Judge Fox in the Strong and Fields decisions, the burden of demonstrating the underlying facts supporting their claim is on Plaintiffs.

Attempting to get past summary judgment, Plaintiffs attempt to distinguish themselves from the Fields plaintiff:

> the borrower [who, coincidentally, was represented by Scholl] was an aging and sickly widow whose physical condition rendered her unable to appear for a trial and whose mental state was such that she had virtually no recollection of the transaction.  Under these circumstances, the borrower could provide no evidence supporting the conclusion that the lender knew or had reason to know that the borrower qualified for a lower title insurance rate than the basic rate she was charged.

Plaintiffs' Mem. at 7.  Also, the prior mortgage that was stipulated to have title insurance occurred eleven years prior to the loan in dispute.  Fields, supra, slip op. at 4.

These are distinctions that make no difference.  It is true that Plaintiffs are neither old nor infirm, and the Option One Mortgage took place a mere six months prior to the Ameriquest Mortgage.  However, their recollection, or lack thereof, is completely indistinguishable from that of Mrs. Fields.  Their own deposition testimony indicates that they simply do not know whether title insurance was issued with the Option One Mortgage.

In response to the SJ Motion, Deborah attests that "We now know that [Option One] must have sold us title insurance in connection with that loan . . ."  Affidavit of Deborah A.

---

[44] Moreover, Plaintiffs' recollection of the transaction is so spotty that they could not testify that Ameriquest or the Silk Abstract did not in fact make such an inquiry.

Madera (D. Madera Aff.") ¶ 10, Exhibit A to Plaintiffs' Mem.  Her choice of language is not

lost on the Court.  Absent from the affidavit is evidence of any personal knowledge that

Option One did in fact sell them title insurance and indeed she provides no basis for what she

now "knows."  Rather her deposition testimony makes clear that she has no recollection of

the details of that transaction.  Similarly, while she makes a sworn statement that "we are

certain that all of the details of this [Option One] loan were available to Ameriquest,"

D. Madera Aff. ¶ 4, there is again a complete factual void behind her certainty.  Affidavits

that contain merely conclusory statements or subjective beliefs, unsubstantiated by facts, are

insufficient to create a material issue of fact precluding summary judgment.  E.g. Bryant v.

Bell Atlantic Maryland, Inc., 288 F.3d 124, 135 (4th Cir. 2002); Far Out Productions, Inc. v.

Oskar, 247 F.3d 986, 997 (9th Cir.2001).

Plaintiffs fail to identify any other evidence that they had title insurance issued with

respect to the Option One Mortgage.  Not only did they fail to retain their copies of

documentation of that relatively recent transaction, but it does not appear that they made any

effort to obtain them for this litigation.  The only witnesses they identify for trial are

themselves and William Hart, whose testimony is insufficient for the reasons stated above.

Were the Madera Adversary to proceed to trial, it is clear that Plaintiffs could not prove the

key element of their TILA claim, existence of title insurance.

C.  Count III - RESPA

Plaintiffs claim under RESPA is based upon statutory requirements imposed upon

a loan "servicer" of a federally related mortgage loan, to respond in a timely manner to a

"qualified written request" from the borrower (or an agent of the borrower) and the penalty for failure to do so.  12 U.S.C. §§ 2605(e)(1)(A), (f).  "Servicer" is defined as "the person responsible for servicing [i.e., receiving the scheduled periodic payments] of a loan (including the person who makes or holds a loan if such person also services the loan)." 12 U.S.C. § 2605(i)(2)-(3).  The parties have agreed the servicer of the Ameriquest Mortgage is AMC Mortgage Services ("AMC").  Uncontested Facts ¶ 6.  As AMC is not a named party and Ameriquest is not a loan servicer subject to suit under RESPA, summary judgment is appropriate on this count.  See Powell v. Aegis Mortgage. Corp., 2007 WL 98372 (D. Md. Jan. 11, 2007) (RESPA applies only to loan servicers); Allah v. New Century Mortgage. Corp., 2006 WL 3196851 (E.D.N.Y.  Nov. 04, 2006) (same).  Plaintiffs' tacit acceptance of this reality is demonstrated by their attempt to add AMC via the Amendment Motion and their subsequent naming of AMC as a defendant in Madera II.

## II.

As I stated above, I entered a bench order denying Plaintiffs' Amendment Motion for the reasons stated in open court.  Presumably in response to that decision, Plaintiffs filed the Madera II Complaint, which is in fact the identical "Amended Complaint" sought by Plaintiffs in this adversary proceeding, including the TILA and Pennsylvania UDAP claims against Ameriquest.  Given my ruling on the SJ Motion, and the potential claim preclusion effect it may have with respect to Ameriquest in Madera II, I find it prudent to set forth in

some detail the basis of my denial of the Amendment Motion.  I address the Amendment Motion only to the extent that it sought to amend claims against Ameriquest.[45]

Fed.R.Civ.P. 15(a), incorporated in this proceeding by Fed. R. Bankr. P. 7015, governs amendment of pleadings.  Where, as here, amendment is sought after a responsive pleading has been filed, the rule provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  The Third Circuit Court of Appeals has instructed that prejudice to the non-movant is the touchstone for denial of a motion to amend, or where there is "bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment."  Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).

The proposed Amended Complaint would have added another "misrepresentation" under the TILA claim, namely that Ameriquest provided Plaintiffs, in addition to the three-day notice required under TILA, see 15 U.S.C. § 1635(a), a one-week right-to-cancel notice that informed them of Ameriquest's policy of providing seven days to cancel.  Plaintiffs assert that this confused the nature of their right to rescind and therefore constitutes a material disclosure violation under TILA.  The amendment would have also added the following violations under Pennsylvania's UDAP statute, claiming remedies of rescission

---

[45]  As to the amendment to address the RESPA claim against AMC, I held that it was not appropriate since separate suit could be commenced against AMC without impeding the progress of this action.  Given the filing of Madera II naming AMC as a defendant, that goal has been accomplished.

and statutory damages: (1) that Ameriquest did not provide the rescission notice allegedly required under 73 P.S. § 201-7, informing them of their right to rescind within three days following the transaction; and (2) that Ameriquest's changing of the loan terms on the day of closing and overcharging for title insurance constitutes prohibited conduct under § 201-2(4)[46] of the UDAP.

These new claims are clearly not based upon newly discovered evidence. Plaintiffs were questioned about the two cancellation notices in their depositions on October 9, 2006,[47] and the facts behind the UDAP claim are already alleged in the extant Complaint. I therefore found not credible the basis stated in the Amendment Motion, namely that Plaintiffs were able to assess their defenses and viable claims in the Proceeding "for the first time in the week of October 23 through 27, 2006." Amendment Motion ¶ 6. Discovery was closed by October 20 without Plaintiffs having sought any extension. Moreover, assessment of their claims and defenses is clearly the job of counsel, who has the legal expertise needed to do so. Scholl has brought claims almost identical to the ones he now seeks to add in other proceedings. See Steele v. Chase Manhattan Mortgage. Corp., 2005 WL 2077271 (E.D. Pa., 2005) (plaintiff alleging UDAP violation for failure to provide rescission notices allegedly required under 73 P.S. § 201-7); Ricciardi v. Ameriquest Mortgage. Co.,, 2005 WL 61416 (E.D. Pa. January 10, 2005), aff'd 164 Fed. App. 221 (2006) (noting Ameriquest's one week

---

[46] The Amended Complaint refers to § 201-1(4). I construe this as a typographical error. There is no such section and the enumerated prohibited conduct is found in 201-2(4).

[47] D. Madera Dep. at 34-35; M. Madera Dep. at 23.

cancellation notice).[48]  In scheduling the Amendment Motion for hearing I expressly ordered that "Plaintiffs shall be present" to allow them to present testimony supporting the motion. Order dated October 31, 2006.  No testimony was forthcoming.  In short, Plaintiffs were fully aware before the conclusion of discovery of the facts giving rise to the new claims asserted, yet their failure to raise the new claims prior to the SJ Motion was "truly unexplained." Lorenz, 1 F.3d at 1414.

Denial of the Amendment Motion was also warranted because the amendment would be futile.  Id.  The new TILA claim, like the one based on title insurance, seeks to rescind the Ameriquest Mortgage and asks for damages for Ameriquest's failure to honor the Scholl Letter requesting rescission.  Granting such relief by necessity entails negating the state foreclosure judgment, which this Court lacks jurisdiction to consider under the *Rooker-Feldman* doctrine.  The same is true for the portion of the UDAP claim seeking rescission under 73 P.S. 201-7.  See supra § I.A.

In addition, an examination of the claims for damages and costs under UDAP indicates its futility.  A person's right to bring a cause of action is governed by 73 P.S. 201-9.2, which states:

(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable

---

[48]  While it does not appear that the one week cancellation notice was asserted as a separate basis for a TILA violation in Ricciardi, the district court nevertheless held that plaintiff did not timely rescind the loan under either the three day or one week periods provided by Ameriquest. I cite to this only to demonstrate that Scholl was fully familiar with Ameriquest's one week form before he filed this adversary action.

loss of money or property, real or personal, <u>as a result of</u> the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater . . .

(emphasis added).  The Pennsylvania Supreme Court has interpreted the highlighted language to mean that, regardless of the prohibited conduct complained of, a person seeking redress must "suffer an ascertainable loss as a result of a defendant's prohibited action." <u>Weinberg v. Sun Company</u>, 777 A.2d 442, 446 (Pa. 2001).  In other words, Plaintiffs must at the very least show a causal nexus between the conduct and the harm.  <u>Sheppard v. GMAC Mortgage Co. (In re Sheppard)</u>, 299 B.R. 753, 766-67 (Bankr. E.D. Pa. 2003).

The Amended Complaint failed to specify any harm <u>that resulted from</u> the alleged UDAP violations.  Plaintiffs alleged that Ameriquest violated the UDAP "by changing the terms of the loan on the day of the loan and knowingly overcharging the Plaintiffs for title insurance . . ."[49]  I have already found that Plaintiffs failed to prove they were entitled to the refinance rate for title insurance, so they cannot claim any title insurance overcharge as a UDAP violation.  If the harm is that Plaintiffs entered into an unfavorable loan agreement, the record shows that Plaintiffs' choice to do so was not because of any conduct of Ameriquest.  Plaintiffs were fully aware of, and quite unhappy with, the loan terms at the closing.  They could have walked away or even rescinded up to a week later, but they freely chose to take the loan because of their need for the cash distribution to pay their son's tuition. <u>See</u> <u>Sheppard</u>, 299 B.R. at 767 (plaintiff's entered into unfavorable loan modification

---

[49]  Amended Complaint ¶ 31, Exhibit 1 to Amendment Motion.

because of their financial need, not any act of lender, thus causation not shown under UDAP).

**CONCLUSION**

For the foregoing reasons, I find that Ameriquest is entitled to summary judgment. As the proposed Amended Complaint would be futile, I properly denied the Amendment Motion from the bench. An Order consistent with the foregoing Memorandum Opinion shall issue.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:  February 8, 2007

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re        :  Chapter 13
            :
DEBORAH A. MADERA,   :  Bankruptcy No. 06-13000DWS
            :
  Debtor.       :

_____

            :
DEBORAH A. MADERA, and  :  Adversary No. 06-0417
MICHAEL MADERA,    :
            :
  Plaintiffs,      :
            :
v.           :
            :
AMERIQUEST MORTGAGE CO., :
            :
  Defendant.     :

_____

# ORDER

  **AND NOW**, this 8th day of February 2007, upon consideration of the Motion for Summary Judgment (the "SJ Motion") of Defendant Ameriquest Mortgage Company ("Ameriquest") and Plaintiffs' Motion for Permission to Amend Complaint (the "Amendment Motion"), and for the reasons stated in the accompanying Memorandum Opinion;

  It is hereby **ORDERED** that the SJ Motion is **GRANTED**.  Summary judgment is entered in favor of Ameriquest and against Plaintiffs;

It is **further ORDERED** that the Amendment Motion is **DENIED** for the reasons

stated on the record at the November 28, 2006 hearing and for the reasons stated in the

accompanying Memorandum Opinion.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge